(110 So. 88)

No. 25512.

## DAVITT v. LONG–BELL FARM LAND CORPORATION et al., with other consolidated cases.

(Oct. 5, 1926.)

*(Syllabus by Editorial Staff.)*

**1. Vendor and purchaser ⬤⟶37(1)—Sales.**

Representations to prospective purchasers, made before investigation at owner's request, *held* immaterial and insufficient for rescission for fraudulent misrepresentation.

**2. Vendor and purchaser ⬤⟶37(1)—Sales.**

Purchasers *held* not entitled to rescission of contract for purchase of farming lands on ground that during investigation they were not permitted opportunity for independent investigation.

**3. Appeal and error ⬤⟶901.**

Appellants' burden of showing error is not discharged in case involving issues of fact by pointing out that evidence is conflicting.

**4. Vendor and purchaser ⬤⟶44—Sales.**

Evidence *held* not to show that prospective purchasers of farming lands were assured that crops shown them could be grown without use of any fertilizer.

**5. Vendor and purchaser ⬤⟶37(1)—Sales.**

Alleged misrepresentation by owner of land that residents were contented and doing well must be shown to have been misrepresentation at time it was made, and not at time of suit for cancellation of contract.

**6. Vendor and purchaser ⬤⟶37(4)—Sales.**

That other lands in same vicinity could have been purchased for much smaller amount *held* not sufficient cause for rescission of contract for purchase.

**7. Vendor and purchaser ⬤⟶37(4)—Sales.**

That demonstration farm shown prospective purchasers was operated at loss *held* of no significance as affording cause for rescission of subsequent contracts to purchase.

Appeal from Fifteenth Judicial District Court, Parish of Beauregard; Thomas F. Porter, Jr., Judge.

Action by A. C. Davitt against the Long-Bell Farm Land Corporation and others, and other consolidated cases. Judgment for defendants, and plaintiff appeals. Affirmed.

Sidney I. Foster, of Leesville, for appellant.

Powell & LeCompte, of De Ridder, W. W. Thompson, of Leesville, and Baker, Potts, Parker & Garwood, of Houston, Tex., for appellees.

Thigpen, Herold, Lee & Cousin, of Shreveport, for David McFarlane.

ST. PAUL, J. This is an action to rescind, with damages, on the alleged ground of fraudulent misrepresentations, certain contracts by which defendants agreed to sell, and plaintiffs agreed to buy, for farming purposes, certain cut-over pine lands in the parishes of Beauregard and Vernon in this state.

### I.

Plaintiffs allege: (A) In substance and effect, that by verbal, written and pictorial representations, falsely and fraudulently made by defendants, as to climate, soil, fertility, crops, and surrounding conditions, they were induced to visit the locality and investigate the lands which defendants were offering for sale;

(B) That upon their said visit of inspection (1) they were "carefully guarded, watched and entertained by defendants, to the extent that all conversation, or opportunity for conversation, with outside parties could not take place"; (2) that plaintiffs "were taken to demonstration farms, cribs and barns, and were then and there told by the agents, boosters and employees of said defendants that the crops there exhibited to them were grown with only ordinary methods, and that all the specimens and samples of crops on exhibit at Kansas City [whence they started upon their tour of inspection], and at Ludington [where said demonstration

farms, etc., were located], were grown on said pine lands [with only ordinary methods, as aforesaid]," which was not true; (3) that they were taken to a vacant spot nearby, called Chasmore, and "were told that a town was going to be built there; and that they (defendants) had already sold all of the lots of said town site; and that a school was to be built immediately for the benefit of purchasers and a depot was to be established," which was untrue; (4) that they were told that the lands were well worth "a larger sum than $25 (per acre), the price being asked," which was untrue; and (5) that they were told that "all who had bought and moved upon said lands were satisfied, contented, and doing well," which was also untrue.

(C) That the following facts, known to defendants, but unknown to plaintiffs, were suppressed, to wit:  (1) That defendants' demonstration farm was being operated at a great loss of money; (2) that certain owners of a large tract of similar lands in the same district "had found, by actual test and experiment, that said lands were not a success as agricultural lands, and that farming was done at a loss on said lands," and that another owner of a large tract of similar lands in the same district "had done the same thing, [but] only as an experiment, and not for demonstration"; (3) that still another owner of a large tract of similar lands in the same district had, about that time, "contracted to sell 20,000 acres of same at $6 per acre" on six years' credit; and (4) that "a large majority of those who had tried out the lands had become dissatisfied, and had failed and abandoned the same."

(D) That because of said fraudulent misrepresentations and suppressions (B and C), and relying upon the verbal, written, and pictorial misrepresentations aforementioned (A), plaintiffs had been deceived and led into error, without which they would not have bought.

The defense is, in substance, the general issue.

## II.

For convenience we take up these matters in irregular order.

[1] It is quite immaterial whether the verbal, written, and pictorial representations first made to plaintiffs were true or false. They were from the start invited, to visit and investigate the lands for themselves, and were definitely told that no land would be sold to any one who had not visited and inspected it for himself and *at his own expense*. This was distinct warning to plaintiffs that they must rely upon their own judgment alone in any purchase which they might make; and—

"Statements of a vendor of land as to the value and worth of the land and the uses to which it had been and might be put, are not such misrepresentations as to cause the contract of sale to be set aside, where all such matters could have been verified by an inspection of the land, which was accessible to the purchaser at all times."  Pike v. Kentwood Bank, 146 La. 704, 83 So. 904; Forsman v. Mace, 111 La. 28, 35 So. 372; Melka v. Brooks-Scanlon Co., Court of Appeal, First Circuit, February 27, 1915 (opinion filed in Tangipahoa parish March 3, 1915).

United States v. New South Farm & Home Co., 241 U. S. 64, 36 S. Ct. 505, 60 L. Ed. 890, Ann. Cas. 1917C, 455, has not the slightest application.  That was a criminal prosecution under section 215 of the federal Criminal Code (35 Stat. at L. 1130, c. 321; Comp. Stat. § 10385), and the court held (in effect) that grossly false representations as to lands offered for sale came within the prohibition of the statute, and that the offense was complete as soon as the false statements were deposited in the mails, regardless of the actual value of the lands, or even whether any were sold on such representations.

## III.

So that this feature of the case hangs upon the question whether it be true, as al-

leged in the petition, that plaintiffs in their visit and endeavor to investigate the lands for themselves "were [without their realizing the fact] carefully guarded, watched and entertained by said defendants, to the extent that all conversation, or opportunity for conversation, with outside parties could not take place."

[2] On this point the evidence can hardly be said to be conflicting; and thereupon the district judge says:

"Prospective purchasers were not herded, guarded or entertained on their inspection trips; nor were they discouraged to talk to southerners as plaintiffs contend. Naturally, in showing prospects about, care was taken to let them see the best and most successful farmers; but every opportunity was afforded for a fair investigation."

And further on he says:

"The court not only finds that there was every reasonable opportunity offered plaintiffs to investigate the lands in question, but finds that they actually made an inspection of them and such investigation as they cared to make, and that plaintiffs bought, not as a result of what defendants told them, but on their own judgment formed as a result of their own inspection and investigation."

And the fact of the matter is that more than 2,000 prospects visited and investigated the lands, of whom less than 1,000 became purchasers, which tends to show that opportunity for full investigation was open to all who chose to avail themselves thereof, and that each of them relied upon his own judgment as to whether he would or would not buy.

[3] On the evidence as a whole our conclusion agrees with that of the district judge; but, granting that there is some conflict of testimony on this point, nevertheless, as just said by this court in Grau v Consolidated Dredging & Mfg. Co. (our No. 25084) post, p. 205, 110 So. 202, this day decided

"The burden rests on appellant to show, to the satisfaction of this court, that the judgment appealed from is erroneous. And that burden is not discharged, in a case involving only issues of fact, by the appellant merely pointing out that the evidence is conflicting and that the trial judge or jury might, on such conflicting evidence, have reached a different conclusion"— citing Hanton v. N. O. Ry. L. & P. Co., 124 La. 562, 583, 50 So. 544; Winn v. Strickland, 151 La. 235, 91 So. 719; Wall v. Dudley, 152 La. 911, 94 So. 441.

## IV.

[4] As to the proposition that plaintiffs were shown certain exhibits, specimens, and samples of crops, and assured that they were grown on such lands "with only ordinary methods" (amplified in the course of the trial to mean, without the use of any fertilizing agency whatever, whether commercial *fertilizer* or barnyard *manure*, or the plowing under of *legume* crops), and that the subject of *fertilizers* was not even so much as mentioned to or by some of them, whilst others were assured that no fertilizer (or fertilizing means) whatever was ever used in the production of such crops, it must be said that it lacks the element of probability, especially when we consider that all these plaintiffs were practical farmers. Nevertheless a number of the plaintiffs so testify, and the testimony of some others conveys the same impression in a general way. But the defendants' managers and agents, and a number of disinterested witnesses (purchasers of some of these lands), and even several of the plaintiffs testify that the use of fertilizers (or some fertilizing means) was always discussed, and that it was well known that some such had to be used in that part of the country (as everywhere else).

We find no special mention of this matter in the opinion of the district judge, but his judgment (for defendants) shows his appreciation of the testimony thereon, and it accords with ours.

## V.

[5] As to the contention that defendants had represented that all who had bought and

moved on said lands were contented and doing well, whereas a majority of them had become dissatisfied, and had failed and abandoned the same, this voluminous record is, for all practical purposes, absolutely barren of information on the subject. True, there is evidence showing that *at the time this suit was tried* there were a number of settlers who had then become dissatisfied and abandoned their farms, and also that a much larger number were still contented and doing well. But that has nothing to do with the question. What plaintiffs had a right to know, if they sought the information, or had it volunteered to them, was, *not* how many settlers would become dissatisfied and how many remain contented during the time which elapsed *after* plaintiffs' purchase of the lands, *but* how many had already become dissatisfied, and how many were still contented *at the time plaintiffs purchased* their lands. And there is nothing in the evidence from which this latter information may be gleaned; but we gather from the record as a whole that most of the dissatisfaction arose long after these plaintiffs purchased, and towards the time when deferred payments on the land began to fall due after one or two bad crop years in that whole section of the state.

Moreover, anything like a general exodus of farmers from the district (had such been the case) was something which could not have been suppressed and concealed from persons looking over the district with a view to engaging in farming therein.

## VI.

As to the conditions at Chasmore (and at Longacre) the trial judge says:

"The court does not find that defendants misrepresented the number of lots sold in Chasmore or in Longacre; nor does it appear that defendants fraudulently promised prospective purchasers that schoolhouses and depots would be built in these places; hence the court is of opinion that no plaintiff bought on any such

162 La.—3

representation or promise. In fact it is understood that counsel for plaintiffs now makes no serious contention on those points."

As to which plaintiffs make no complaint here.

## VII.

[6] For the rest, it is a matter of no moment what other holders of similar lands were asking for them. If others were asking less for the same lands, it is of them that plaintiffs should have purchased, nor were they obliged to buy at all if the price asked did not suit them. And moreover, with lands, as with everything else, wholesale prices and retail prices are quite different things; a quick turnover at a small profit being infinitely better than a larger profit after a long wait. Doubtless these defendants would have gladly parted with their whole 300,000 acres even at a less price than $6 had they been able to find a purchaser willing to take them off their hands forthwith. Cf. Lyon Lumber Co. v. La. Tax Commission, 158 La. 990, 105 So. 39.

[7] And since a "demonstration farm" by its very nature must also be given up more or less to experimenting purposes, it follows that it is of no significance that such a farm was operated at a loss, or that plaintiffs were not informed thereof, since they should have known it.

Finally, the evidence in this record does not support the proposition that farming cannot be followed with success in the parishes of Beauregard and Vernon. The same had been said "ad nauseam" of Tangipahoa and the parishes adjoining the same, now one of the richest agricultural districts in the whole world. On the contrary, the evidence shows, and the fact is, that farming can be successfully conducted in Beauregard and Vernon parishes, where the soil and climate are the same as that of Tangipahoa.

Our conclusion is that plaintiffs are not entitled to the relief they seek.

Decree.

The several judgments herein appealed from are therefore all affirmed.

OVERTON, J., recused, having been consulted in the case prior to ascending· this bench.